Kleinhein v. Bentley.

---

No. 20,705.

C. K. KLEINHEIN, *Appellant,* V. O. H. BENTLEY et al., as The Board of Commissioners of the City of Wichita et al., *Appellees.*

SYLLABUS BY THE COURT.

CITY ORDINANCE—*Weight and Grade of Plumbing Material—Ordinance and State Statute Valid.* A city ordinance, passed pursuant to statutory authority, regulating the weight and grade of plumbing material, examined and *held* to be within the purpose of the statute. *Held,* further, that the court is unable to say that either the statute or the ordinance is invalid because it has no direct or substantial relation to the public health and welfare.

Appeal from Sedgwick district court, division No. 2 ; THORNTON W. SARGENT, judge. Opinion filed June 10, 1916. Affirmed.

*Dempster O. Potts,* and *W. P. Campbell,* both of Wichita, for the appellant.

*James Conly,* city attorney, and *S. S. Hawks,* assistant city attorney, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one to restrain the board of commissioners of the city of Wichita from enforcing an ordinance relating to the subject of plumbing. The contention was the ordinance is void because unreasonable. An injunction was denied and the plaintiff appeals.

Section 839 of the General Statutes of 1909 reads as follows:

"Each city with a population of seven thousand or more in the state having a system of water-supply or sewerage shall by ordinance, within

three months of the passage of this act, prescribe rules and regulations for the materials, construction and inspection of all plumbing and sewerage placed in or in connection with any building in each city, and the board of health or proper authorities shall further provide that no plumbing work shall be done, except in case of repairing leaks, without a permit first being issued therefor upon such terms and conditions as such city shall prescribe."

Pursuant to this authority the city in the year 1912 enacted an ordinance which has since been amended, containing the following provisions:

"Section 23. Fittings approved by this ordinance shall be used for all connections in drain, soil, waste and vent pipes of iron or brass. The main soil waste pipes inside of any building below ground shall be constructed of extra heavy tar coated inside and outside cast iron pipe and fittings.

"Section 24. Soil and waste pipes above ground in any building shall be of extra heavy soil pipe.

"Section 64. All plumbing brass goods such as bath cocks, bibbs, faucets, stop and waste cocks, etc., shall conform in weight, water way, quality and general formation to that class of plumbing goods or plumbing fixtures known to the trade as extra heavy. No goods of light weight, or cast from yellow brass and known to the trade as competition goods shall be used."

Extra grade plumbing goods are all heavier than those designated as "standard" and are all more expensive. Extra grade brass fixtures are cast from "red brass" or brass in which the copper constituent largely preponderates over the zinc. "Yellow brass" fixtures are made of drawn or rolled brass, the seams being brazed by electricity. In yellow brass the zinc constituent largely preponderates over the copper. Competition goods are simply goods sold in competition with those of extra grade.

There was evidence that before 1912 standard goods were freely used in the city of Wichita, as they are in many other cities of the United States. Such goods stand the tests of initial inspection as well as those of extra grade, are quite as durable as those of extra grade, and consequently are just as sanitary. The advantage in their use is that the builder who must build modestly can do so with satisfaction to himself and safety to the public and at a considerable saving in cost. There was some evidence tending to show that independent plumbers are not able to procure extra grade material on equal terms with members of the association of master plumbers. On the

Kleinhein v. Bentley.

other hand, there was evidence that the light weight goods are not durable, do not stand the strain incident to settling, quickly give out and leak from a variety of causes and are sometimes so light they will not stand the use of the wrench in making repairs.   Leaking plumbing is not sanitary and the extra grade material is the cheaper in the end.   Permission to use light weight goods opens the door to deception and fraud and embarrasses inspection because of the lack of a standard. These subjects were all duly considered by the board of commissioners and the ordinance in question is based on the experience of other cities.

The plaintiff's claims are supported by high medical authority.   The following is an editorial from the Journal of the American Medical Association for August 29, 1914:

"It is not surprising perhaps that old ideas concerning the causes of disease survive in some strata of society a long time after these ideas have been generally outgrown or discredited.   All the same it is a little disconcerting to find that typhoid fever can still be complacently attributed to bad plumbing.   When we read that 'insufficient laws regulating plumbing and sanitation in Virginia, Maryland and the District of Columbia are largely responsible for the high typhoid rate and the prevalence of other diseases in the two states and the district,' and again that 'much of the fever and other forms of disease with which the health authorities are constantly wrestling is caused by noxious gases and vapors emanating from neglected or defective pipes in the homes of the people,' we are inclined to rub our eyes and ask ourselves if the education of the community is really proceeding at the pace we sometimes like to believe. The assertions quoted above, however, were reported as made at the Association of Plumbers, Gasfitters and Steamfitters which recently met in Richmond, Va., and not at a convention of health officers or physicians.

"It is hardly necessary to point out that typhoid fever—or any other fever—is not caused by bad smells, and that the small quantity of the gases of decomposition found in well-ventilated sewers has never been proved to exert any injurious effect whatever on health.   A connection between plumbing and health has been shown to exist at just one point. Plumbing is of value to public health only so far as it removes human excreta from the immediate neighborhood of dwellings and so does away with the danger of fly-borne typhoid and other infection which arises from allowing infectious material to accumulate in family privy-vaults.   Disease germs are not found in sewer air; indeed, it is difficult on physical grounds to see how they could get there.   The 'noxious gases and vapors,' so dear to the plumber's imagination, are conspicuous by their absence in all perfectly constructed sewer systems, as every visitor to the great sewers of Paris and other modern cities well knows.   'Defective plumbing'

has about as much relation to public health as any other mechanical defect in house construction.

"On the financial aspects of modern city plumbing ordinances we prefer not to dwell at this time. It is a well-recognized fact that these ordinances are drawn with no uniformity in our American cities and that what is required in one city may be prohibited in another. High authorities maintain that the system of modern house plumbing which is made legally obligatory on housebuilders in many places entails a large, needless and altogether unjustifiable expense. Conceivably it is to the financial interest of plumbing supply houses—or somebody—to have the required system of plumbing as elaborate and as expensive as possible.

"One feature of this situation deserves attention. It is plain that the most serious obstacle to the universal replacement in sewered towns of the dangerous privy-vault by the water-carriage system is the high cost of the plumbing. In this respect every unnecessary refinement and elaboration in plumbing outfits and legal requirements is a harm, not a help, to public health. The greatest possible simplicity and cheapness compatible with efficiency is what is needed in really 'sanitary' plumbing, not a labyrinth of traps, vents and back vents. If the plumbing interests really wish to aid in hygienic welfare of the community they can best do this, not by insisting on still more complicated devices and 'inspections,' but by simplifying and cheapening the cost of installing and maintaining the pipes and fixtures essential for carrying off the house wastes in a speedy and inoffensive manner. Finally let us ask this question: To what extent do the plumbing ordinances in our American cities represent the prevailing opinion of public health experts and trained health officials, and to what extent do they represent the efforts of commercially interested individuals or organizations to entrench themselves behind the active if not always well-informed desire of the people to safeguard the public health?" (Vol. 63, pt. 2, p. 784.)

It is just possible that the foregoing views are those of a bacteriologist who is biased somewhat by his specialty and that defective plumbing may produce effects deleterious to health beyond those described. However this may be, we have here a subject open to debate which has been duly considered by the legislature and by the city commissioners, and this court can not declare as a matter of fact that the statute has no direct or substantial relation to the public health and welfare. This being true, the statute is valid. The ordinance obeys the mandate of the statute and so far as the court can see does no more than carry out the intention of the legislature. This being true, the court can not, under well understood rules of law, set aside the ordinance.

The judgment of the district court is affirmed.

DAWSON, J., dissenting.